FILED

2023 Sep-25  AM 09:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RODNEY JONES,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | **Case No.: 2:22-cv-741-AMM** |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Rodney Jones brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    INTRODUCTION

On November 1, 2019, Mr. Jones protectively filed an application for a period of disability and disability insurance benefits under Title II of the Act, alleging disability as of May 1, 2018. R. 11, 125–41. Mr. Jones alleged disability due to Human Immunodeficiency Virus ("HIV"), delusional disorder, type 2 diabetes mellitus, hypertension, peripheral neuropathy, post-traumatic stress disorder

("PTSD"), anxiety disorder, Barrett's esophagus, abnormal brain scan, and psychosis. R. 126–27. He has at least a high school education and has past relevant work experience as an accountant and a tech support specialist. R. 30–31.

The Social Security Administration ("SSA") initially denied Mr. Jones's application on July 2, 2020. R. 11, 125–41, 174–80. Mr. Jones's request for reconsideration was denied on October 23, 2020. R. 11, 142–68, 181–85. Mr. Jones filed a request for a hearing before an Administrative Law Judge ("ALJ") on December 10, 2020. R. 11, 186. That request was granted. R. 187–89. Mr. Jones received a video hearing before ALJ Mary E. Helmer on August 11, 2021. R. 11, 71–104, 218–50. At the hearing, Mr. Jones appeared and testified with the assistance of his attorney, Stephen Rygiel. R. 11, 71–104. Mr. Jones's friend, Janet Griffin, appeared and testified at the hearing. R. 11, 71–104. An impartial vocational expert, Lakeisha Rogers, also appeared and testified at the hearing. R. 11, 71–104. On August 24, 2021, ALJ Helmer issued a decision, finding that Mr. Jones was not under a disability from May 1, 2018, through the date of the decision. R. 11–33. Mr. Jones was fifty-five years old at the alleged disability onset date, and was fifty-nine years old at the time of the ALJ decision. R. 31.

Mr. Jones appealed to the Appeals Council, R. 251–53, which denied his request for review on April 12, 2022, R. 1–4. After the Appeals Council denied Mr. Jones's request for review, the ALJ's decision became the final decision of the

Commissioner and subject to district court review. R. 1–4. On June 14, 2022, Mr. Jones sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    THE ALJ'S DECISION

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two

steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. *Id.* In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Mr. Jones would meet the insured status requirements of the Act through December 31, 2021. R. 11, 13. Next, the ALJ found that Mr. Jones "ha[d] not engaged in substantial gainful activity since May 1, 2018, the alleged onset date." R. 13. The ALJ explained that, although Mr. Jones "worked after the alleged disability onset date," such "work activity did not rise to the level of substantial gainful activity" and "[wa]s an unsuccessful work attempt." R. 13. The

ALJ further explained that Mr. Jones "receiv[ed] unemployment benefits . . . in the second quarter of 2020," and "testified that he has applied for many jobs consistent with his past work." R. 13.

The ALJ decided that Mr. Jones had the following severe impairments: diabetes mellitus, HIV, degenerative disc disease of the lumbar spine, hiatal hernia with gastroesophageal reflux disease ("GERD"), anemia, Barrett's esophagus, and obesity. R. 14. The ALJ found that Mr. Jones's non-melanoma skin cancer, hypothyroidism, urticarial, GERD, obstructive sleep apnea, right adrenal gland removal, hypertension, and significantly decreased energy were not severe impairments because they did not "cause more than a minimal impact on [Mr. Jones's] ability to function" and did not "cause[] more than minimal limitation in [Mr. Jones's] ability to do basic work activities for any period of twelve continuous months." R. 14–15.

The ALJ found that, although Mr. Jones complained of knee pain and an MRI in 2016 showed findings of mild degenerative changes in his right knee, "[e]xaminations have frequently shown no musculoskeletal swelling or deformity, normal range of motion, and normal gate." R. 15–16. Further, the ALJ found that, although Mr. Jones alleged visual impairment, "there [wa]s no evidence of a severe visual impairment." R. 15. The ALJ also found that, although Mr. Jones alleged

difficulty using his hands, "there [wa]s no evidence of severe functional limitations of the hands." R. 18.

Further, the ALJ found that, although Mr. Jones denied the use of illegal drugs during the hearing, "the record establishe[d] that [he] has a history [of] methamphetamine use that caused delusions." R. 15. The ALJ found, however, that "there [wa]s no evidence of methamphetamine use since November 2018, or psychotic symptoms within three months of discontinuing the methamphetamine use, which is fewer than 12 months after his alleged onset date of disability." R. 15.

The ALJ also found that Mr. Jones's "medically determinable mental impairments of anxiety and depression" were not severe impairments because they "do[] not cause more than minimal limitation in [his] ability to perform basic mental work activities." R. 16. The ALJ also found that Mr. Jones's "medically determinable mental impairment[s] cause[d] no more than 'mild' limitation in any of the [four broad] functional areas" "of mental functioning set out in the disability regulations for evaluating mental disorders." R. 16–17.

The ALJ further found that, although Mr. Jones alleged having headaches, his "headaches ha[ve] not shown to be accompanied by specific clinical signs and diagnostic findings required to substantiate the existence of a medically determinable impairment for headaches." R. 18. The ALJ also found that, although Mr. Jones "testified to a variety of other symptoms including incontinence . . . and

convulsions . . . , there [wa]s no evidence in the record of th[o]se complaints or a diagnosis of th[o]se conditions." R. 18. Accordingly, the ALJ found that Mr. Jones's alleged incontinence and convulsions "[we]re not medically determinable impairments." R. 18.

Overall, the ALJ determined that Mr. Jones "d[id] not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments" to support a finding of disability. R. 19.

The ALJ found that Mr. Jones's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 22. The ALJ found that Mr. Jones "has the residual functional capacity to perform sedentary work . . . except he can frequently climb ramps/stairs." R. 20. The ALJ determined that Mr. Jones "can never climb ladders, ropes, or scaffolds" and "should perform no balancing." R. 20. The ALJ found that Mr. Jones "can frequently stoop, kneel, and crouch." R. 20. But the ALJ prohibited "crawling." R. 20. The ALJ found that Mr. Jones should: (1) "avoid concentrated exposure to extreme temperatures, humidity and wetness"; (2) "perform no work at unprotected heights or [using] hazardous machinery"; (3) "have no exposure to very loud noise environments"; (4) "avoid concentrated exposure to pulmonary irritants such as dust, fumes, odors, gases and poor

ventilation"; (5) "have no excessive vibration[,] . . . commercial driving[,] . . . work on uneven terrains[, or] . . . assembly line productions requirements." R. 20.

The ALJ enlisted a vocational expert to identify the past relevant work performed by Mr. Jones. R. 30–32. The ALJ found that Mr. Jones's past relevant work was that of a tech support specialist and an accountant. R. 30. The ALJ determined Mr. Jones is "capable of performing past relevant work as an accountant." R. 30–31.

According to the ALJ, Mr. Jones is "an individual of advanced age" and "has at least a high school education," as those terms are defined by the regulations." R. 31. The ALJ enlisted a vocational expert to ascertain whether there are "any occupations . . . which could be performed by an individual with the same age (59), education (college), past relevant work experience, and residual functional capacity . . . with the additional limitation of occasional non-confrontational work related interaction with the general public and occasional work related interaction with co-workers . . . and which require skills acquired in [Mr. Jones's] past relevant work." R. 31–32. That expert concluded that there are indeed a number of such jobs in the national economy, such as a tax clerk, laundry pricing clerk, mortgage loan computation clerk, and bookkeeper. R. 32. The ALJ thus concluded that Mr. Jones "has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy." R.

32. In other words, "there are other jobs that exist in significant numbers in the national economy that [Mr. Jones] also can perform, considering [his] age, education, work experience, transferable skills, and residual functional capacity." R. 31.

Based on these findings, the ALJ concluded that Mr. Jones had not been under a disability within the meaning of the Act from May 1, 2018, through the date of the ALJ's decision. R. 12, 32–33. Mr. Jones now challenges that decision.

## III. FACTUAL RECORD

The medical records included in the transcript and referenced by the parties span many years and cover various complaints. Mr. Jones's records first reveal a visit to TKC Dermatology at the University of Alabama at Birmingham ("UAB") in August 2009. R. 581–82. However, Mr. Jones's alleged onset date is May 1, 2018. R. 125. Also, Mr. Jones's arguments relate to his peripheral neuropathy, alleged carpal tunnel syndrome ("CTS"), anxiety, PTSD, and depression. *See e.g.*, Doc. 11 at 3, 11, 14–15. Therefore, the court's review of the medical records will relate to the relevant time period and relevant medical complaints.

On May 9, 2018, Mr. Jones presented at The Kirklin Clinic at UAB with his "mother and friend who relay[ed] their concerns about [his] behavior." R. 733. An assessment of Mr. Jones provided that he had delusional paranoia, but was "[a]lert, oriented x 3, recognize[d] th[e] provider and [was] willing to follow . . . instructions

9

for further evaluation." R. 733. Mr. Jones was "sent . . . directly to the ER and . . .
was admitted to inpatient psych." R. 734.

Mr. Jones's intake (on May 9, 2018) and discharge (on May 18, 2018)
information from UAB Hospital is extensive. R. 1021–1139. When Mr. Jones
arrived at the emergency department on May 9, 2018, his physical examination
provided:

> **General**: Alert, no acute distress.
> . . .
>
> **Neurological**: Alert and oriented to person, place, time,
> and situation, No focal neurological deficit observed.
> **Psychiatric**: Cooperative.

R. 1021; *see also* R. 1045, 1049. Another physical examination provided that Mr.
Jones's musculoskeletal system had a "[n]ormal range of motion," "[n]o swelling,"
and "[n]o deformity." R. 1033; *see also* R. 1046, 1049. And another physical
examination provided:

> **Const**: No acute distress, alert, awake.
> . . .
>
> **Neuro**: Orientation: normal, appropriate for age.
> Sensation: normal, no gross deficits.
> **Psych**: Erratic behavior, tangent[i]al speaking.

R. 1024. The report further indicated that Mr. Jones had "rapid[,] tangent[i]al
speech," and "disorganized speech." R. 1024. A review of his symptoms and his past
medical history included anxiety. R. 1022–23, 1032; *see also* R. 1048. The records

further provided that Mr. Jones had a history with abuse of crystal meth, but that such problem was "[i]nactive/[r]esolved." R. 1024. Mr. Jones's final diagnosis was acute delusions. R. 1022.

In addition to the physical examination, Mr. Jones also had a psychosocial assessment. R. 1027. The assessment provided:

> Mood: Anxious
> Appearance: Appropriately dressed, Appropriately groomed
> Orientation: Oriented x 3
> Rapport: Appropriate
> Memory: Memory intact
> Affect/Behavior: Anxious
> Judgment: Grossly impaired
> . . .
>
> Delusions: Paranoia
> . . .
>
> Hallucinations: Auditory
> . . .
>
> Speech: Coherent, Appropriate

R. 1027. A review of symptoms provided:

> **Constitutional**: Shock like current in upper and lower extremities, No fever, No chills, No sweats, No weakness.
> . . .
>
> **Musculoskeletal**: No neck pain, No joint pain, No claudication.
> **Neurologic**: Alert and oriented X4.
> **Psychiatric**: Delusional.

R. 1030–31; *see also* R. 1046–47. Mr. Jones's mental status exam provided:

General Appearance[:] Gender Male. Age equal. Race
White. Build normal. Grooming appropriate. Hygiene
appropriate. Attire appropriate. Attitude/Manner Pleasant
Cooperative.
Behavior: Alert, Eye Contact (Good).
Motor: Normal.
Mobility/Gait: Within normal limits.
Mood: Euthymic.
Affect: Quality (Euthymic, Calm), Mood congruent,
Range (Appropriate).
Speech: Rate (Normal), Volume (Normal), Spontaneity
(Normal), Articulation (Normal).
Thought Processes: Coherent, Stream (Disorganized),
Associations (Intact).
Abnormal/Psychotic thoughts: Suicidal Ideation (None),
Homicidal Ideation (None), Delusions (Persecutory).
Hallucinations: Auditory, Not visual.
Cognition: Oriented to person, Oriented to place, Oriented
to time, Attention (Fair), Concentration (Fair).
Insight: Poor.
Judgment: Poor.

R. 1033; *see also* R. 1049. The records noted that Mr. Jones "[wa]s exhibiting

symptoms consistent with persecutory delusions which appears to have started 6

months ago. [Mr. Jones] denie[d] any substance use and[,] though his UDS is

positive for amphetamines, this could likely be a false positive due to his HAART

regimen. . . . Other differentials could include HIV psychosis[,] however unlikely as

CD4 count [wa]s at 337." R. 1035.

During Mr. Jones's hospitalization, a neurology consult conducted a physical

examination of Mr. Jones, which provided:

**Mental status**: Alert and oriented X 4
**Speech**: Clear, fluent

. . .

**Tone**: Normal
**Atrophy/Fasciculations**: None.
**Sensation**: Normal to light touch throughout.
**Cerebellar**: Normal finger nose finger, heel to shin
**Gait**: Normal unstressed gait.
**Reflexes**: 2+ throughout, except 3+ at bilateral patellars,
symmetric, toes are downgoing
. . .

**Cranial nerves**: EOMI, face symmetric
**Motor**: 5/5 throughout

R. 1058, 1060. Further, during his hospitalization, Mr. Jones received social services and the records indicate that he had symptoms of anxiety. R. 1108, 1113.

On May 14, 2018, Mr. Jones presented at The Kirklin Clinic at UAB for an evaluation of peripheral neuropathy. R. 727–28. The record provides that, "[o]n examination [Mr. Jones's] motor strength [was] 5/5, [his] sensory examination [was] normal DTR 2+ and symmetric, . . . and [that he had] negative tinel's sign and phalen's sign." R. 728. The study was abnormal. R. 731. "There [wa]s electrophysiological evidence of bilateral median neuropathy at wrist, moderately severe on the right, and mild on the left, as can be seen in carpal tunnel syndrome." R. 731. "There [wa]s also electrophysiologic evidence compatible with very mild sensory predominant peripheral neuropathy," and a "[c]linical correlation [wa]s indicated." R. 731.

Mr. Jones's discharge summary provided that "[a]bout 2 weeks ago, [Mr. Jones] started having 'electrical feeling' mainly in his feet and hands at times[,]" and "describe[d] it [a]s more like vibration than lightning-shooting pain." R. 1046. By the time Mr. Jones was discharged, his mental status exam provided:

> General Appearance[:] Gender Male. Age equal. Race White. Build normal. Grooming appropriate. Hygiene appropriate. Attire appropriate casual. Attitude/Manner Pleasant Cooperative.
> Behavior: Alert, Eye Contact (Good).
> Motor: Normal.
> Mobility/Gait: Within normal limits.
> Muscle Strength and Tone: Normal.
> Mood: "good".
> Affect: Quality (Calm), Mood congruent, Behavior congruent, Range (Appropriate).
> Speech: Rate (Normal), Volume (Normal), Spontaneity (Normal), Prosody (Normal), Rhythm (Normal), Articulation (Normal).
> Thought Processes: Coherent, Logical, Stream (Organized, Goal directed), Associations (Intact).
> Abnormal/Psychotic thoughts: Suicidal Ideation (None, Commit[t]ed to safety), Homicidal Ideation (None, Committed to safety).
> Hallucinations: None.
> Cognition: Oriented to person, Oriented to place, Oriented to situation, Attention (Good), Concentration (Fair), Executive Function (Impaired).
> Fund of Knowledge: Fair, Vocabulary (Fair), General Knowledge (Fair).
> Insight: Moderate.
> Judgment: Moderate.

R. 1050. He was discharged with a diagnosis of delusional disorder, HIV disease, diabetes, and hypertension. R. 1045.

On May 21, 2018, Mr. Jones presented at The Kirklin Clinic at UAB for a diagnostic evaluation and comprehensive medication monitoring following his hospital admission. R. 714, 724. During his evaluation, Mr. Jones reported "some [history] of depression after 9/11 as he was working on Wall Street at the time." R. 715. Mr. Jones also reported that "he experienced panic attacks at this time but has not had one in 10 years." R. 715. He reported situational anxiety due to finances and his mother's health and reported anxiety as an active problem. R. 715, 717, 719, 721. Mr. Jones further reported that he "was seen at Grayson and Associates prior to hosp[italization]" and "was given a 'clean bill of health.'" R. 715. Mr. Jones also reported past drug use "but none in 3 years." R. 715. Further, his medical history included abuse of crystal meth, but indicated that it was an "[i]nactive/[r]esolved [p]roblem." R. 720, 722.

The history section provided that Mr. Jones lived alone and independently in his home. R. 718. Further, a list of Mr. Jones's mental status provided:

> Appearance: Clean, Attire (Casual).
> Demeanor: Cooperative, Engageable.
> Speech: Normal rate and rhythm.
> Motor: Normal.
> Affect: Congruent to content.
> Thought Process: Goal directed.
> . . .
>
> Cognitive Functioning: Oriented x 3, Judgment impaired, Insight impaired.

R. 719. His diagnosis was delusional disorder. R. 719.

On June 20, 2018, Mr. Jones presented at The Kirklin Clinic at UAB regarding his HIV diagnosis. R. 697–98. The history section provided that Mr. Jones lifted weights three to four times per week for an average of sixty minutes, and that he lived alone and independently in his home. R. 699. The history section also provided that Mr. Jones was independent, driving, and able to walk. R. 699. A list of problems included anxiety. R. 700. The physical examination reported in relevant part:

> **General**: Alert and oriented, No acute distress.
> . . .
>
> **Musculoskeletal**[:] Normal range of motion. Normal strength. No tenderness. Normal gait.
> . . .
>
> **Neurologic**: Alert, Oriented, Normal sensory, Normal motor function, Cranial Nerves II-XII are grossly intact.
> **Psychiatric**: Cooperative, Appropriate mood & affect, Remains de[]lusional.

R. 701. The assessment reported concern that "the delusions may be associated with drug use." R. 703–04. The patient education section provided that there were no evident barriers to learning. R. 705.

In August 2018, on two occasions, Mr. Jones presented at Alabama Allergy & Asthma Center regarding certain allergy symptoms. R. 467, 534, 537. The history of present illness reports provided that Mr. Jones "[h]ad to be in [a] psych ward in May of 2018 because [he was] very concerned about the mold in his house." R. 467, 538. That report further provided: "Generally speaking: fatigue, brain fog,

depression, joint pain[, and] 'tired all the time.'" R. 467, 538. One of the reports

provided a review of symptoms, which indicated in relevant part:

> **General:** (-) fever. (-) chills. (+) has lost weight. (-) weight
> gain. (+) experiencing fatigue.
> . . .
>
> **Musculoskeletal:** (+) joint pain. (-) arthritis (+) muscle
> aches or weakness (-) ulcers on legs or feet.
> . . .
>
> **Neurological:** Patient has history of seizure disorder. (+)
> headaches (+) tingling (+) numbness (+) poor balance (-)
> stroke. (+) difficulty with speech (-) tremors
> **Psychiatric:** (+) anxiety. (+) memory loss. (+) panic
> disorder. (-) bipolar. (-) schizophrenia.

R. 539. Further, Mr. Jones's physical exams in relevant part reported:

> **General Appearance:** Patient is in no acute distress. Vital
> signs noted.
> . . .
>
> **Musculoskeletal:** Moves all extremities.
> **Neurologic:** No gross neurological deficits. Patient is
> alert.
> **Psychiatric:** Patient is oriented. No significant
> abnormalities of mood and affect.

R. 468, 539–40.

On August 29, 2018, Mr. Jones presented at The Kirklin Clinic at UAB for

"medication monitoring following his intake evaluation on 5/21/2018." R. 689, 691.

Mr. Jones described his mood as "depressed and irritable" and wanted "to talk to

CRNP about getting on an antidepressant." R. 689, 691. Mr. Jones described his

anxiety and panic as being caused by lack of sleep. R. 689. The attending physician's assessment provided that Mr. Jones said "he [wa]s not using meth, [wa]s not paranoid, blame[d] 'bio-films' for his prior symptoms," and "decline[d] to initiate any medications." R. 691–92. Mr. Jones also stated that his "mood [wa]s 'okay.'" R. 692. The attending physician further noted that Mr. Jones's "[g]rooming [wa]s neat/clean[, a]ffect [wa]s irritable, mood-congruent[, g]ait and speech WNL[, t]hought process [wa]s coherent and logical[, t]hought content paranoid[, and c]ognition intact." R. 692. The attending physician's impression was that Mr. Jones was "[n]oncompliant with medication." R. 692. The patient education section provided that barriers to learning were due to "acuity of illness, [and] desire/motivation." R. 693.

On September 19, 2018, Mr. Jones presented at The Kirklin Clinic at UAB for a follow-up visit related to his HIV diagnosis. R. 671–72. The history section provided that Mr. Jones was hospitalized for delusional disorder from May 10, 2018 to May 18, 2018. R. 672. The history section further provides that Mr. Jones "[s]elf-discontinued risperidone 2mg at HS and gabapentin 300mg TID because he didn't like the sedating & dry mouth associated with risperidone 2mg tablets." R. 672. According to the history section, Mr. Jones had "been researching medications on the internet" and "[c]ontinues to believe someone is coming into his home and possibl[y] doing things to him." R. 672.

Further, the history section provided that Mr. Jones lifted weights three to four times per week for an average of sixty minutes, and that he lived alone and independently in his home. R. 673. The history section also provided that Mr. Jones was independent, driving, and able to walk. R. 673. A list of problems included anxiety. R. 674. The physical examination reported in relevant part:

> **General**: Alert and oriented, No acute distress.
> . . .
>
> **Musculoskeletal**[:] Normal range of motion. Normal strength. No tenderness. Normal gait.
> . . .
>
> **Neurologic**: Alert, Oriented, Normal sensory, Normal motor function, Cranial Nerves II-XII are grossly intact.
> **Psychiatric**: Cooperative, Appropriate mood & affect, Remains de[]lusional.

R. 675. The assessment and plan provided that Mr. Jones "continue[d] to have paranoid delusions" and was a "[n]o show [to his] last . . . psych appointment[]." R. 677. The records further reported concern that "the delusions may [have] be[en] associated with drug use." R. 677. The patient education section provided that there were no evident barriers to learning. R. 679.

On October 22, 2018, Mr. Jones presented at The Kirklin Clinic at UAB for a treatment plan review of his treatment dated May 21, 2018. R. 669–70. The review indicated that Mr. Jones was "[m]aking progress" and that his treatment need was "[h]igh." R. 670. Mr. Jones "reported DFA, decreased appetite, low energy,

depressed mood, irritability, increased anxiety, and paranoia." R. 670. Mr. Jones also "decline[d] medication." R. 670.

On November 7, 2018, Mr. Jones presented at The Kirklin Clinic at UAB for medication monitoring. R. 663, 665. The basic information section of the report included a diagnosis of delusional disorder. R. 663. The report provided that Mr. Jones denied any substance abuse three times. R. 664, 665. The notes section provided that Mr. Jones reported "improved sleep and appetite, off and on mood with irritability, decreased patience, off and on energy and occ anxiety related to recent people in his life dying." R. 665. Mr. Jones also "endorse[d] mild delusional thinking/paranoia in regards to someone coming into his home and taking things." R. 665. The notes section also provides that Mr. Jones "[wa]s not . . . taking any psychiatric meds, [and] took himself off the medication prescribed when he was released from the hospital." R. 665. The patient education section provided that barriers to learning were due to "acuity of illness, [and] desire/motivation." R. 666.

On December 6, 2018, handwritten notes were taken at Grayson and Associates. R. 992. Those notes reference PTSD and contain the following quote: "I self[-]medicate [with] meth." R. 992. On December 20, 2018, Mr. Jones presented at Grayson and Associates and an intake form was completed. R. 986–88. The intake form provided that Mr. Jones began using meth in 2011, but quit using for ten years. R. 987. Mr. Jones began using again two years prior to his intake appointment and

his last use was two weeks prior to the appointment. R. 987. A note regarding past psychological treatment provided: "UAB - Inpatient for 1 week in 6/2018. Depression & meth use. Heart racing." R. 987. The diagnostic impression provided was Major Depressive Disorder and PTSD. R. 988. The records show that Mr. Jones periodically met with this therapist from December 2018 through March of 2019. R. 977–88, 991.

On January 16, 2019, Mr. Jones presented at Lifestyle Management of Birmingham, Inc. for a follow-up exam and lab review regarding hypertension. R. 1158. During that visit, Mr. Jones "denie[d] anxiety, depression or memory loss." R. 1160. The "[d]epression screen [wa]s positive for major symptoms." R. 1162. The records indicate that Mr. Jones was "under the care of a counselor at Grayson and [A]ssociates." R. 1162. The attending physician noted that they would "start him on 20mg of Celexa daily" and that "he ha[d] previously tried Prozac but could not tolerate it." R. 1162.

On February 13, 2019, Mr. Jones presented at The Kirklin Clinic at UAB regarding his HIV diagnosis. R. 643–44. The history of present illness report provided that Mr. Jones "[r]ecently engaged with Grayson and Associates" and that "Dr. Dan Sullivan is his new psychiatrist." R. 644, 652. The history of present illness further provided that Mr. Jones had "[n]o new complaints" and that he "his delusional   thoughts   stopped   following   the   discontinuation   of   crystal

methamphetamine about 3 months ago." R. 644, 652. The clinic notes also provided

that Mr. Jones "is extremely embarrassed about his use of crystal meth." R. 652.

Further, the history section provided that Mr. Jones lifted weights three to four

times per week for an average of sixty minutes, and that he lived alone and

independently in his home. R. 644–45. The history section also provided that Mr.

Jones was independent, driving, and able to walk. R. 645. A list of problems included

anxiety. R. 646. The physical examination reported in relevant part:

> **General**: Alert and oriented, No acute distress.
> . . .
>
> **Musculoskeletal**[:] Normal range of motion. Normal
> strength. No tenderness. Normal gait.
> . . .
>
> **Neurologic**: Alert, Oriented, Normal sensory, Normal
> motor function, Cranial Nerves II-XII are grossly intact.
> **Psychiatric**: Cooperative, Appropriate mood & affect,
> Normal judgment, PHQ 2 = 4, PHQ 9 = 14.

R. 647–48. The patient education section provided that there were no evident barriers

to learning. R. 653.

On March 4, 2019, Mr. Jones presented at The Kirklin Clinic at UAB for an

annual skin exam. R. 633–35. The physical exam provided that Mr. Jones was

"[a]lert and oriented" with "[n]o acute distress." R. 635. The patient education

section provided that there were no evident barriers to learning. R. 635. A neurologic

review of his symptoms indicated that Mr. Jones was "[a]lert and oriented X4." R.

636. A problems list included anxiety. R. 637. The past medical history provided that Mr. Jones's substance abuse of crystal meth began on January 1, 2002, and resolved on May 30, 2012. R. 637. It further provided that Mr. Jones's delusional disorder was "[m]eth related" and resolved. R. 637. Further, the history section provided that Mr. Jones lifted weights three to four times per week for an average of sixty minutes, and that he lived alone and independently in his home. R. 637–38. The history section also provided that Mr. Jones was independent, driving, and able to walk. R. 638.

On June 4, 2019, Mr. Jones presented at The Kirklin Clinic at UAB for a dermatology procedure. R. 613. The physical exam, neurologic review, problems list, past medical history, history section, and patient education section were all consistent with the corresponding sections from Mr. Jones's March 4, 2019 appointment. R. 615–18.

On July 24, 2019, Mr. Jones presented at The Kirklin Clinic at UAB for a routine HIV visit. R. 597. The history of present illness report provided that Mr. Jones had "[n]o crystal methamphetamine since [his] last visit." R. 597. The clinic notes provided that Mr. Jones's delusional disorder "[r]esolved within 3 months of discontinuation of crystal methamphetamine use." R. 604. The clinic notes also provided that Mr. Jones was "under the care of Grayson and Associates based[] Dr. Sullivan," and "is extremely embarrassed about his use of crystal meth." R. 604.

Further, the history section provided that Mr. Jones lifted weights three to four times per week for an average of sixty minutes, and that he lived alone and independently in his home. R. 598. The history section also provided that Mr. Jones was independent, able to drive, and able to walk. R. 599. A list of problems included anxiety. R. 599. The physical examination reported in relevant part:

> **General**: Alert and oriented, No acute distress.
> . . .
>
> **Musculoskeletal**[:] Normal range of motion. Normal strength. No tenderness. Normal gait.
> . . .
>
> **Neurologic**: Alert, Oriented, Normal sensory, Normal motor function, Cranial Nerves II-XII are grossly intact.
> **Psychiatric**: Cooperative, Appropriate mood & affect, Normal judgment, PHQ 2 = 4, PHQ 9 = 14.

R. 601–02. The patient education section provided that there were no evident barriers to learning. R. 605.

On January 13, 2020, Mr. Jones presented at Lifestyle Management of Birmingham, Inc. for a follow-up exam and lab review regarding hypertension. R. 1150. The records indicate that Mr. Jones had a history of chronic generalized anxiety disorder. R. 1150. A review of Mr. Jones's symptoms showed that he was "[p]ositive for anxiety and depression." R. 1152. The attending physician's assessment included major depressive disorder and anxiety disorders. 1153–54. The plan provided that Mr. Jones's "[a]nnual depression screen [wa]s positive for major

symptoms" and that Mr. Jones "[wa]s on treatment." R. 1154. It further provided that Mr. Jones was "starting the disability process," which was "causing extra stress," which was "compounded by his underlying depression and anxiety issues." R. 1154. The plan also provided that, "[d]ue to [Mr. Jones's] debilitating conditions (uncontrolled diabetes, anxiety with depression, HIV status and Barret[t']s esophagus), [the attending physician] . . . agree[d] with the assessment to start Disability process." R. 1154.

On January 14, 2020, Mr. Jones presented at The Kirklin Clinic at UAB for a consult regarding his diabetes mellitus. R. 583–84. The doctor found among other things a history of Mr. Jones being sedentary and of anxiety. R. 584. The physical examination reported in relevant part:

> **General**: Alert and oriented. No acute distress, no cushingoid or acromegalic features.
> . . .
>
> **Musculoskeletal**[:] Normal range of motion.
> . . .
>
> **Neurologic**: alert and oriented x 3. No motor deficits. Intact sensory exam on examination with 10 gr. monofilament and tuning fork. DTR 2+ with normal relaxation phase.
> **Psychiatric**: Appropriate mood & affect.

R. 586.

In February and March 2020, Mr. Jones presented at Lifestyle Management of Birmingham, Inc. on a number of occasions. R. 1200–14. On February 10, 2020,

Mr. Jones presented for a follow-up exam regarding Type 2 diabetes. R. 1210. During that visit, Mr. Jones "state[d] that he ha[d] neuropathy in his hands and feet," and he was "[a]dvised to increase his Gabapentin." R. 1214. Then, on March 30, 2020, Mr. Jones presented for a follow-up exam regarding hypertension and diabetes. R. 1200. The records indicate that he was having symptoms of bilateral hand and foot pain due to neuropathy. R. 1200, 1202–03. Mr. Jones's assessment was "Type 2 diabetes mellitus with diabetic mononeuropathy" and his Gabapentin prescription was increased. R. 1202–03. Further, although Mr. Jones "denie[d] anxiety," his assessment also included "[g]eneralized anxiety disorder." R. 1202.

On March 25, 2020, Mr. Jones presented to The Kirklin Clinic at UAB with a number of issues, which included peripheral neuropathy and anxiety with panic attacks. R. 1233–36.

On June 16, 2020, Mr. Jones underwent a psychological evaluation. R. 1240–43. The evaluation provided that Mr. Jones "appeared to be a bit histrionic in his presentation and he displayed no obvious signs of mental health issues." R. 1241. The evaluation further provided that Mr. Jones "appear[ed] to be unimpaired by mental health/cognitive issues as they apply to his daily adaptive functioning" and "appeared to be a reliable informant in this area of inquiry." R. 1242. The report concluded that Mr. Jones "did not present with, nor did he report symptoms

consistent with a diagnosable mental health issue, other than being addicted to Xanax which he g[o]t[] from his family physician." R. 1243.

On July 29, 2020, Mr. Jones presented at The Kirklin Clinic at UAB for a routine HIV visit. R. 1262. The general exam and diagnosis section of the record provided that Mr. Jones has anxiety and is "[o]n Xanax 1 mg nightly . . . for PTSD." R. 1263, 1268. That section further provided that Mr. Jones has depression and is "[o]n Citalopram 20 mg daily." R. 1264, 1268. As to depression, the records provided that Mr. Jones "is worried about his mother" and "[d]enie[d] suicidal ideations." R. 1264. The records provided that Mr. Jones's PHQ-2 score was a 6 on July 29, 2020, that he was to coordinate with a social worker that day, and that he was encouraged to continue following up with a psychiatrist. R. 1264. The general exam and diagnosis section also provided that Mr. Jones had peripheral neuropathy, but that it was "stable with Gabapentin 400 mg 3-4 times per day (takes around 6 times if needed)." R. 1265, 1268. The records indicate that Mr. Jones's Gabapentin prescription "was increased from 300 mg to 400 mg during COVID." R. 1265. Mr. Jones's physical exam provided:

> **General**: Alert and orientated, No acute distress.
> . . .
>
> **Musculoskeletal**[:] Normal range of motion. Normal strength. Normal gait. . . . Hand grasp is equal and strong bilaterally[.]
> . . .

> **Neurologic**: Alert, Oriented, Normal sensory, Normal motor function, Cranial Nerves II-XII are grossly intact, DTR are equal and brisk bilaterally in patellar and biceps. **Psychiatric**: Cooperative, Appropriate mood & affect.

R. 1270–71.

On January 27, 2021, Mr. Jones presented at The Kirklin Clinic at UAB for a routine follow-up visit regarding his HIV diagnosis. R. 1296. The general exam and diagnosis section of the record provided that Mr. Jones had depression and was "[o]n Xanax 2-3 times a day and Lexapro 40 mg." R. 1297. The section further provided that Mr. Jones had peripheral neuropathy and was "[o]n gabapentin 400 mg." R. 1298. Mr. Jones was "informed . . . to take up to 10 tablets a day as needed," but "has never had more than six tablets." R. 1298. Mr. Jones "[r]ate[d] his pain at 8/10 on a pain scale." R. 1298. Mr. Jones "[s]tate[d] that he experience[d] more pain on the right foot as compared to his left foot" and that he "stumble[d] and drag[ged] his right foot." R. 1298. That section did not reference Mr. Jones's hands. *See* R. 1298.

On February 19, 2021, Mr. Jones presented at The Kirklin Clinic at UAB for an "initial evaluation for iron-deficiency anemia." R. 1306. The records indicate that he had diagnoses of peripheral neuropathy and anxiety with panic attacks. R. 1306. A depression screen was conducted on that day, and Mr. Jones was assessed as having severe depression with a PHQ-2 score of 6 and a PHQ-9 score of 24. R. 1311.

On April 12, 2021, Mr. Jones presented at The Kirklin Clinic at UAB for a "follow-up for iron-deficiency anemia." R. 1315. During that visit, Mr. Jones

reported that he was "feeling depressed most of the time, however he [wa]s on medication managed by an outside provider for this and denie[d] any suicidal ideations." R. 1315. The records indicate that Mr. Jones "ha[d] effective coping mechanisms in place" for his depression. R. 1315. A depression screen was conducted on that day, and Mr. Jones was assessed as having severe depression with a PHQ-2 score of 6 and a PHQ-9 score of 24. R. 1320. Mr. Jones was advised to receive psycho-oncology services, and he "voiced understanding and declined counseling and/or other psychosocial supportive services at th[at] time" because he had "[a]lready established care with psychosocial providers." R. 1324.

Finally, on July 14, 2021, Mr. Jones presented at UAB for a "follow-up for iron-deficiency anemia." R. 1356. The record indicates that he had diagnoses of peripheral neuropathy and anxiety with panic attacks. R. 1356. A depression screen was conducted that day, and it provided:

> PHQ Little Interest: Not at all
> PHQ Feeling Down, Depressed or Helpless: Not at all
> PHQ-2 Score: 0

R. 1364.

## IV.  STANDARD OF REVIEW

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d

835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See id.* No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal

standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.   DISCUSSION

Mr. Jones alleges that the ALJ's decision should be reversed and remanded because the ALJ committed error in making the decision. See Doc. 11. Specifically, Mr. Jones argued that:

> (1) At Step Two, the [ALJ's] classification of Mr. Jones's peripheral neuropathy in his hands and mental health impairments all as non-severe impairments is not supported by substantial evidence, and the ALJ committed legal error in h[er] assessment of Mr. Jones's hand impairments.

> [(2)] The ALJ's decision also never mentions or evaluates the effect of Mr. Jones's carpal tunnel syndrome, a separate and distinct impairment from Mr. Jones's diabetic peripheral neuropathy, on his hands.

*Id.* at 3.

### 1.  The ALJ's Determination of Severe Impairments

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual claiming benefits must prove that he is disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The burden is on the claimant to introduce

evidence in support of his application for benefits. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). The governing regulations establish a five-step sequential evaluation process for determining whether an individual is disabled and thus eligible for benefits or supplemental security income. 20 C.F.R. § 404.1520. The evaluator follows the steps in order. *See id.*

The second step of the sequential disability evaluation requires the ALJ to consider the combined severity of the claimant's medically determinable physical and mental impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment is severe if it significantly limits a claimant's physical or mental abilities to do basic work activities and lasts at least twelve months. *See id.* If a claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled." *Id.* "The finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two, [she] is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r*, 420 F. App'x 901, 902 (11th Cir. 2011). "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r*, 382 F. App'x 823, 824–25 (11th

Cir. 2010) (stating "all that step two requires" is that the ALJ concluded the claimant "had a severe impairment").

Mr. Jones argued that, "[r]egarding severity, Mr. Jones's peripheral neuropathy, unmentioned CTS . . . , anxiety, PTSD, and depression are not slight abnormalities," but rather "are severe impairments causing him more than minimal functional limitation." Doc. 11 at 11, 14. Mr. Jones argued that "[t]he ALJ's conclusion that Mr. Jones's . . . CTS and peripheral neuropathy cause no 'severe functional limitation of the hands'" is legal error, *id.* at 14 (quoting T. 18), because "the correct standard for classifying an impairment as severe versus non-severe" is that "a severe impairment must simply cause 'more than a minimal [functional] limitation,'" *id.* (quoting *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993)) (emphasis omitted). Mr. Jones also argued that his "depression, anxiety, and PTSD cause him more than minimal limitation in his ability to function, and "should have been considered severe." *Id.* at 15, 17 (citing *Shalala*, 985 F.2d at 532).

The Commissioner responded that the ALJ's finding that "'there is no evidence of severe functional limitations of the hands' is irrelevant" and that Mr. Jones "is merely playing semantics and cannot demonstrate the ALJ actually applied the incorrect legal standard." Doc. 16 at 11 (quoting T. 18) (emphasis omitted). The Commissioner asserts that, "[e]ven if the ALJ did not use the words from the regulation in relation to her ultimate finding regarding [Mr. Jones's] hand

impairments, an ALJ is not required to use particular phrases or formulations as long as the court can determine what statutory and regulatory requirements the ALJ applied." *Id.* (citing *Jamison v. Bowen*, 814 F.2d 585, 588–89 (11th Cir. 1987)). Further, the Commissioner asserts that remand is appropriate only when there is no indication that the ALJ applied the correct standard. *Id.* (citing *Thaxton v. Kijakazi*, No. 1:20-cv-00616-SRW, 2022 WL 983156, at *8 (M.D. Ala. Mar. 30, 2022)).

According to the Commissioner, "there is a clear indication the ALJ applied the correct standard—she cited the correct standard at the beginning of her step-two discussion (Tr. 14), and her discussion of the objective evidence related to [Mr. Jones's] hand impairments showed no functional limitations related to [his] hands (Tr. 18)." *Id.* Further, the Commissioner responded that, "as the ALJ discussed, substantial evidence demonstrated that [Mr. Jones's] PTSD, depression, [or] anxiety did not rise to the level of a severe impairment" or "significantly limit his ability to perform basic work functions." *Id.* at 12, 14.

Mr. Jones replied that "[t]he ALJ's use of the wrong legal standard is far from irrelevant" because "[t]he ALJ's determination that [Mr. Jones's] hand impairments cause him no 'severe functional limitations' implies that his hand impairments cause him some functional limitations; otherwise the word 'severe' has no meaning." Doc. 17 at 1–2.

"In this circuit, even if an ALJ errs in failing to indicate that a diagnosed impairment is severe, that error is harmless if the ALJ concludes that the claimant has another severe impairment because 'that finding is all that step two requires.'" *Adams v. Colvin*, No. 2:13-CV-00755-AKK, 2014 WL 287493, at *3 (N.D. Ala. Jan. 24, 2014) (quoting *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir.2010)). At step two of the analysis, the ALJ identified Mr. Jones's diabetes mellitus, HIV, degenerative disc disease of the lumbar spine, hiatal hernia with GERD, anemia, Barrett's esophagus, and obesity as severe impairments. R. 14. Accordingly, the ALJ satisfied step two of the sequential disability analysis and Mr. Jones's argument that the ALJ committed reversable error by failing to classify his hand and mental impairments as severe impairments fails.

## 2. The ALJ's Determination of Residual Functional Capacity

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The residual functional capacity "is not the *least* an individual can do despite . . . her limitations or restrictions, but the *most*." *Id.* The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an

ordinary work setting on a regular and continuing basis" as well as a description of "the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence . . . ; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

The residual functional capacity assessment "must be based on *all* of the relevant evidence in the case record, such as: Medical history, Medical signs and laboratory findings, The effects of treatment . . . , Reports of daily activities, Lay evidence, Recorded observations, Medical source statements, Effects of symptoms . . . , Evidence from attempts to work, Need for a structured living environment, and Work evaluations, if available." *Id.* at *5.

The ALJ has the exclusive responsibility to assess the claimant's residual functional capacity. *Moore v. Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016). The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his or her findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all

of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Mr. Jones argued that the "use of the incorrect legal standard is harmful error" because, "[h]ad the ALJ used the proper [standard] . . . , [s]he . . . would have found Mr. Jones's CTS and diabetic peripheral neuropathy severe impairments" and "would have included one or more [residual functional capacity] limitations for Mr. Jones's hands use." Doc. 11 at 14–15. According to Mr. Jones, "[s]uch limitation may have ruled out [his] ability to perform the accountant position at Step 4, which requires frequent fingering and occasional reaching and handling[,] . . . as well as the other jobs given at Step Five based on transferrable skills from the accountant position – tax clerk, laundry pricing clerk, mortgage loan clerk, bookkeeper – all of which require between frequent and constant reaching, handling, and fingering." *Id.* at 15. Mr. Jones further asserts that "[t]he failure to find [his] mental impairments severe is especially harmful here, as [he] was at advanced age (55+) since his alleged

onset date, and the ALJ found that [he] could perform his past sedentary work." *Id*. at 17. According to Mr. Jones, "[a] limitation to unskilled work . . . would eliminate [his] skilled [past relevant work] as an accountant and direct a finding of disability under Grid Rule 201.06." *Id*.

In his reply, Mr. Jones asserts that "the question is whether there is record evidence that [his] carpal tunnel syndrome and diabetic peripheral neuropathy impose additional limitations on [him] not already captured by his [residual functional capacity]." Doc. 17 at 2 (citing *Boone v. Kijakazi*, No. 1:21-cv-34-JTA, 2022 WL 4133288, at *6 (M.D. Ala. Sept. 12, 2022)). Mr. Jones asserts that his "carpal tunnel syndrome and diabetic peripheral neuropathy impose manipulative limitations that affect his ability to work, and are not included in his [residual functional capacity]." *Id.* at 3. Mr. Jones thus asserts that the Commissioner "has not shown that substantial evidence supports the ALJ's finding of no [residual functional capacity] manipulative limitations for [his] use of his hands." *Id*.

Further, Mr. Jones replied that "the ALJ's Step Two analysis suggests the ALJ classified [his] peripheral neuropathy in his hands as a non-medically determinable impairment, meaning the ALJ did not consider this impairment beyond Step Two at all" because "[a]n ALJ does not consider non-medically determinable impairments when determining the [residual functional capacity]." *Id.* (citing SSR 96-8p; *Cherkaoui v. Comm'r of Soc. Sec.*, 678 F. App'x 902 (11th Cir. 2017)). Specifically,

Mr. Jones argues that "[s]andwiched at the end of her Step Two analysis between . . . non-medically determinable impairments . . . is 'difficulty using his hands.'" *Id.* at 4 (quoting T. 18). According to Mr. Jones, "one cannot conclude that substantial evidence supports the ALJ's assessment of [his] hand limitations" in light of "(1) the placement of the ALJ's 'use of hands' assessment in the middle of the . . . discussion of [Mr. Jones's] other non-medically determinable impairments, [and] (2) the ALJ's use of the wrong legal standard for assessing this impairment." *Id.* at 4–5.

Mr. Jones further replied that, "it is possible a classification error at Step Two may be harmless," but "this presumption of harmlessness has two prerequisites." *Id.* at 5. According to Mr. Jones, "the classification error must only concern severity, not medical determinability," and "[i]f the classification error at Step Two concerns medical determinability, then the error is not harmless because non-medically determinable impairments . . . are not considered when determining [residual functional capacity]." *Id.* (citing *Reives v. Kijakazi*, No. 1:21-00475-N, 2022 WL 1478983, at *7 (S.D. Ala. May 10, 2022)). Mr. Jones asserts that "the ALJ's decision highly suggests she classified [his] peripheral neuropathy as a non-medically determinable impairment, meaning no limitations were assessed to this impairment." *Id.* (citing *Cherkaoui*, 678 F. App'x at 904). Mr. Jones further asserts that "the ALJ's use of a 'no severe functional limitations' standard for evaluating [his] hand impairments at Step Two is so patently erroneous that it leaves any true

understanding of the ALJ's reasoning for her classification beyond any meaningful judicial review." *Id.*

Citing *Reives*, Mr. Jones argued that, "[t]o uphold the ALJ's decision, . . . this Court must find that the ALJ accounted for the true limiting effects of [his] carpal tunnel syndrome and bilateral diabetic peripheral neuropathy on his hands at Steps Three through Five." *Id.* at 6 (cleaned up). According to Mr. Jones, "such finding would appear implausible" because "the [residual functioning capacity] includes no manipulative limitations whatsoever (Tr. 20), and [Mr. Jones] has pointed to ample evidence that the pain in his hands affects his ability to work." *Id.*

Mr. Jones also replied that the Commissioner "fails to appreciate the detrimental effects of 'repetitive use' impairments." *Id.* According to Mr. Jones, "[w]hile the extent of [his] bilateral hand pain may not be entirely evident during brief physical examination assessments, these assessments are not a fair representation of what hand pain [Mr. Jones] would experience in jobs requiring using both hands to reach, handle, and/or finger frequently-to-constantly throughout the workday." *Id.* at 7 (cleaned up). Mr. Jones asserts that "[f]requent to constant use of the hands in jobs requiring typing, using a mouse, and heavy computer usage are precisely the type of job functions [Mr. Jones] testified he cannot do due to his carpal tunnel syndrome and diabetic peripheral neuropathy pain." *Id.* Mr. Jones argues that "[t]he ALJ . . . us[ed] snapshot musculoskeletal examination findings (normal

strength, normal tone, etc.) to completely negate the obvious detrimental effects of 'repetitive use' impairments for people with moderately severe carpal tunnel syndrome and diabetic peripheral neuropathy." *Id*.

The ALJ specifically discussed each of Mr. Jones's physical and mental complaints and incorporated his limitations into his residual functional capacity. R. 14–30. With respect to Mr. Jones's mental impairments, the ALJ cited Mr. Jones's medical records showing that he was diagnosed with depression and generalized anxiety disorder, R. 15; therapy, psychiatric, and other relevant medical records showing that Mr. Jones presented as "alert" and oriented" and with an "appropriate mood and affect," that he stated in therapy that he was doing well, and that he had "several normal psychiatric examinations," R. 15–16; the adult function report, R. 320–27; Dr. Duncan's psychological consultative examination, R. 1239–43; and the State agency reviewing psychologist's opinions regarding Mr. Jones's limitations in mental functioning, R. 143–68. With respect to Mr. Jones's hand impairments, the ALJ noted Mr. Jones's EMG Report, R. 728–31, and other relevant medical records showing Mr. Jones having "normal strength bilaterally, normal tone, . . . normal motor . . . , and . . . no atrophy," R. 18. Further, the ALJ cited treatment notes that Mr. Jones's "peripheral neuropathy was also reported to be stable with gabapentin." R. 24.

The ALJ properly considered Mr. Jones's testimony. In considering Mr. Jones's symptoms, the ALJ first determined whether there were impairments that "could reasonably be expected to produce" those symptoms and second evaluated the "intensity, persistence, and limiting effects" of Mr. Jones's symptoms "to determine the extent to which they limit [his] . . . ability to do work-related activities." R. 21. The ALJ considered Mr. Jones's testimony regarding his symptoms. R. 21–22. The ALJ described Mr. Jones's adult disability and function reports and testimony in her decision:

> The claimant has alleged his human immunodeficiency virus (HIV), delusional disorder, Type II diabetes mellitus, hypertension, peripheral neuropathy, post-traumatic stress disorder, anxiety disorder, Barrett's esophagus, abnormal brain scan, and psychosis limit his ability to perform work activity (Exhibit 5E). The claimant has further alleged his impairments affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, and use his hands (Exhibit 6E). Additionally, the claimant has alleged having difficulty with his memory, understanding, and concentration. He has further alleged having difficulty completing tasks, following instructions, and get along with others. At the telephone hearing, he also testified that he stays in bed on some days because of low energy, and he testified that he has trouble seeing.
>
> At the telephone hearing, the claimant's friend testified that she has known the claimant since he was about six years old, and she testified that they go to church together. She further testified that. She testified that she cooks for him and sends soup over to him. She further testified that his mother helped with cleaning, and she indicated that someone comes to help and [do] the yard work. She testified that the claimant was not sharp as he once was,

and she testified that he could no longer help her with her taxes. She testified that he had a breakdown in 2018, and she helped take the claimant to hospital (it does not appear that she was aware of the claimant's methamphetamine use at this time). He has done work at the church and other physical things; however, she testified that the claimant would get really tired. She further testified that the claimant worked at the U.S. Census last year. She testified that she had a lot of trouble walking at one time, and that he had hard time getting around.

R. 21. The ALJ concluded that Mr. Jones's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but his "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 21–22. Mr. Jones's statements were properly considered by the ALJ in forming the residual functional capacity.

Based on these findings, the ALJ limited Mr. Jones to "a range of sedentary work activity," but found that "he can frequently climb ramps/stairs." R. 20, 30. Further, the ALJ found that Mr. Jones could "never climb ladders, ropes, or scaffolds" and "should perform no balancing." R. 20. The ALJ found that Mr. Jones could "frequently stoop, kneel, and crouch." R. 20. But the ALJ prohibited "crawling." R. 20. The ALJ found that Mr. Jones should: (1) "avoid concentrated exposure to extreme temperatures, humidity and wetness"; (2) "perform no work at unprotected heights or [using] hazardous machinery"; (3) "have no exposure to very loud noise environments"; (4) "avoid concentrated exposure to pulmonary irritants

such as dust, fumes, odors, gases and poor ventilation"; (5) "have no excessive vibration[,] . . . commercial driving[,] . . . work on uneven terrains[, or] . . . assembly line productions requirements." R. 20. Substantial evidence supports the ALJ's determination of Mr. Jones's residual functional capacity.

Further, Mr. Jones's argument that the ALJ classified his hand impairments as non-medically determinable impairments fails. Unlike the ALJ's findings regarding Mr. Jones's alleged headaches, incontinence, and convulsions, the ALJ did not find that Mr. Jones's hand impairments were "not medically determinable impairments," but rather found that "there [wa]s no evidence of severe functional limitations of the hands." R. 18. As to Mr. Jones's contention that the ALJ's alleged classification of his hand impairments as non-medically determinable "mean[s] the ALJ did not consider this impairment beyond Step Two," Doc. 17 at 3, the court notes that the ALJ stated in the residual functional capacity analysis that, "[d]uring [a] July 2020 HIV follow-up visit . . . , [Mr. Jones's] peripheral neuropathy was . . . reported to be stable with gabapentin," R. 24.

### 3. Allegations and Discussion of Mr. Jones's Carpal Tunnel Syndrome

Mr. Jones asserts that "[t]he ALJ never once mention[ed] or discusse[d] Mr. Jones's CTS in her decision," which "is error." Doc. 11 at 9. According to Mr. Jones, "the Eleventh Circuit . . . requires [that] . . . the ALJ . . . in h[er] analysis or findings at least mention all of the claimant's individual impairments." *Id.* at 9 (cleaned up).

In support of that assertion, Mr. Jones cites *Jones ex rel. T.J.J. v. Astrue*, No. 1:10-CV-328-TFM, 2011 WL 1706465 (M.D. Ala. May 5, 2011).

Mr. Jones also asserts that the "omission of carpal tunnel syndrome as a severe or non-severe impairment was harmful . . . because the ALJ . . . was unaware that Mr. Jones's CTS and diabetic peripheral neuropathy were separate impairments affecting Mr. Jones's hands and that it was the CTS affecting Mr. Jones's hands prior to December 2019 (the onset of his uncontrolled diabetic peripheral neuropathy pain)." Doc. 11 at 11 (cleaned up). Mr. Jones cites no case law to support this assertion.

The Commissioner responded that Mr. Jones "ignores the context in which the court made the statement [in *Jones* that Mr. Jones] cites in his brief." Doc. 16 at 9. According to the Commissioner, "the ALJ . . . met the baseline requirement discussed in *Jones*." *Id*. at 10. The Commissioner further responded that Mr. Jones "never once alleged his carpal tunnel syndrome was a disabling impairment[,] . . . did not mention carpal tunnel syndrome during the administrative hearing[,] . . . did not list carpal tunnel syndrome as a disabling medical condition in his disability reports[,] . . . did not mention carpal tunnel in his function reports[, and] . . . did not even mention his carpal tunnel" in "the representative brief submitted to the ALJ prior to the administrative hearing." *Id*. at 8–9. According to the Commissioner, "the Eleventh Circuit has held[ that] a claimant's failure to allege an impairment defeats

the claimant's later contention that the ALJ did not properly consider that impairment." *Id.* at 9 (citing *Duffy v. Comm'r of Soc. Sec.*, 736 F. App'x 834 (11th Cir. 2018)). Accordingly, the Commissioner asserts that, "[b]ecause [Mr. Jones] failed to allege his carpal tunnel was a disabling condition, he cannot . . . contend the ALJ failed to properly consider it." *Id.* Mr. Jones did not reply to the Commissioner's assertions. *See* Doc. 17.

The Eleventh Circuit has held that an ALJ is "under no duty to consider . . . [an] alleged impairment" when the claimant "did not allege—in either h[is] application for benefits or at h[is] hearing—that [such impairment] was a basis for h[is] disability." *Duffy*, 736 F. App'x at 837; *accord Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010); *Vesy v. Astrue*, 353 F. App'x 219, 225 (11th Cir. 2009). Because Mr. Jones did not allege that his carpal tunnel syndrome was a basis for his disability, *see* R. 1–394, the ALJ was under no obligation to consider his carpal tunnel syndrome.

## VI.   CONCLUSION

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 25th day of September, 2023.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE